```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/4/2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                          :

RITCHIE CAPITAL MANAGEMENT, L.L.C., et al.,    :
                                            :

                                Plaintiffs,    :          14 Civ. 8623 (PAE)
                                            :

              -v-                        :          <u>OPINION & ORDER</u>
                                            :

GENERAL ELECTRIC CAPITAL CORP.,        :
                                            :

                              Defendant.    :
                                            :
------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Between 1998 and 2001, defendant General Electric Capital Corporation ("GECC") had a lending relationship with two entities affiliated with Minnesota businessman Thomas Petters. In 2008, Ritchie Capital Management, LLC and the other five plaintiffs[1] (collectively, "Ritchie") also invested with Petters. In fall 2008, law enforcement officials discovered that Petters was operating a Ponzi scheme. In 2009, Petters was convicted of fraud for operating a $3.65 billion Ponzi scheme, and was sentenced to, *inter alia*, a term of 50 years' imprisonment.

      Ritchie, which allegedly lost $157 million from its 2008 investments with Petters, now sues GECC. Ritchie principally alleges that GECC had discovered Petters' Ponzi scheme in 2000, but chose not to disclose the fraud in order to ensure that GECC would recover its investment. Ritchie brings three state-law causes of action against GECC: aiding and abetting fraud, civil conspiracy to commit fraud, and negligence.

---

[1] These are Ritchie Capital Management, Ltd.; Ritchie Special Credit Investments, Ltd.; Rhone Holdings II, Ltd.; Yorkville Investment I, L.L.C.; and Ritchie Capital Structure Arbitrage Trading, Ltd. *See* Dkt. 1, Ex. A.

GECC now moves to dismiss the Complaint in its entirety.  For the reasons that follow, the Court grants GECC's motion.

## I.      Background

### A.      Factual Background[2]

Ritchie's allegations are set out in detail below, but it is useful first to summarize Ritchie's core allegations, which are: (1) "By October 2000, GECC had uncovered (and could have ended) what would turn out by September 2008 to be the third largest Ponzi scheme in U.S. business history"; (2) instead of exposing Petters' fraud, GECC joined it to ensure that it "would be paid and make a large profit"; (3) thereafter, GECC allowed Petters to "use GECC's business stature, recommendations and UCC-1 filings to victimize many more lenders including Plaintiffs"; and (4) "Had GECC not conspired with Petters and aided and abetted Petters' fraud, Petters and his companies would not have been able to defraud Plaintiffs."  Compl. ¶¶ 1–2.

#### 1.      Petters' Scheme

Petters began his Ponzi scheme in 1998.  *Id.* ¶ 5.  The scheme was a "fraudulent purchase order financing scheme," in which Petters solicited loans from private investors ostensibly to enable his companies to finance the purchase of brand-name consumer electronics merchandise. *Id.* ¶ 18.  Petters represented to these lenders that their loans would be repaid when his companies sold these electronics to big-box retailers like Costco Wholesale Corporation ("Costco").  *Id.* ¶ 19.  To induce lenders to make the requested loans, Petters would provide a copy of a purported purchase order, pursuant to which a Costco subsidiary, National Distributors, would buy the electronics as soon as Petters Company, Inc. ("PCI") had the goods.  *Id.* ¶ 20.

---

[2] The Court's account of the facts is drawn from Ritchie's Complaint.  Dkt. 42 ("Compl.").  The Court may "also take judicial notice of relevant matters of public record."  *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (citing, *inter alia*, Fed. R. Evid. 201(b)).

The authorities eventually discovered—in fall 2008—that this was all a Ponzi scheme.  *Id.* ¶¶ 1, 5.

### 2.      GECC's Lending Relationships with Petters, and GECC's Discoveries

On March 26, 1998, GECC entered into a credit agreement with another Petters corporation, Petters Capital, Inc.  *Id.* ¶ 24.  Specifically, GECC entered into a revolving credit facility ("the Petters Capital Line") to fund Petters Capital's purchases of electronics for resale to big-box retailers like Costco.  *Id.*  In exchange for providing funding, GECC received various fees, including a "success fee" ranging from 10 to 30 percent of Petters Capital's gross profit margin on the sale of merchandise.  *Id.* ¶ 25.

On December 17, 1999, GECC entered into a $55 million line of credit with a second Petters affiliate, Red Tag ("the Red Tag Capital Line").  *Id.* ¶ 29.  This revolving credit facility had "the similar purpose" of funding electronics purchases.  *Id.*

### a.      The Petters Capital Line

Around this time, Petters drafted and presented a generic letter of recommendation (about himself) to Richard Menczynski, a GECC executive in charge of the Petters accounts.  *Id.* ¶¶ 28, 30.  Petters asked that GECC issue this letter of recommendation.  *Id.* ¶ 30.  GECC complied:  It issued the recommendation letter on its letterhead, dated January 4, 2000, and addressed "To Whom It May Concern" (the "January 2000 recommendation letter").  *Id.* ¶¶ 30–31.  The letter described Petters Capital as "an excellent customer" that had "performed well" and described Petters "[o]n a personal level . . . to be of high character and possessing strong moral values."  *Id.* ¶ 31.  Ritchie alleges that "[e]ven after GECC discovered Petters' fraudulent purchase order financing scheme, GECC never told Petters to cease his use of the January 2000 Letter nor asked with whom it had been shared."  *Id.* ¶ 32.

By October 2000, Petters owed GECC more than $45 million under the Petters Capital Line.  *Id.* ¶ 38.  On October 23, 2000, with payments owed to GECC past due, Paul Feehan of GECC contacted Costco to request verification of the amounts Costco owed Petters Capital.  *Id.* ¶ 39.  Costco replied that its records did not confirm the amounts set forth by GECC.  *Id.*  GECC then sent Costco copies of the National Distributors purchase orders.  *Id.* ¶ 40.  In a follow-up phone call, a Costco representative informed Feehan that those purchase orders were not valid National Distributors purchase orders.  *Id.*  Petters quickly learned that GECC had contacted Costco; he immediately called GECC's Feehan "and complained angrily" that Feehan had contacted Costco and jeopardized Petters' relationship with his largest customer.  *Id.* ¶ 41.  "Feehan accused Petters of fraud and threatened to destroy Petters' business."  *Id.* ¶ 42.

Although Petters Capital owed GECC more than $45 million that was due October 27, 2000, Ritchie's Complaint alleges that Feehan (on behalf of GECC) agreed to an extension "in order to give Petters time to induce third parties to make loans to PCI that would be used to pay off GECC."  *Id.* ¶ 44.  Specifically, the Complaint alleges:

> These conversations culminated in GECC's tacit agreement to knowingly and voluntarily participate in a common scheme to fraudulently induce third parties to loan PCI the money that was needed to pay debts owed to GECC by using false transaction documents, and to conceal PCI's fraudulent Costco purchase order financing scheme from present and future lenders to PCI and related companies, in consideration for Feehan's knowing and voluntary participation in this common scheme.  Petters represented to Feehan:  "I tell you what, I'll make you look like a hero, I promise you, on the Petters [Capital] situation and the RedTag situation."

> Feehan knew and understood from the plain meaning of the words used in his conversations with Petters between October 24 and October 27, 2000, that Petters was offering to obtain the approximately $45 million needed to pay Petters Capital's debts to GECC by means of PCI's fraudulent purchase order financing scheme that GECC had obtained actual knowledge of as a result of the Costco Discovery and make Feehan look like a hero, in consideration for Feehan's voluntary participation and complicity in a common scheme to use false purchase order transaction documents and intentional misrepresentations about Petters' relationship with GECC to fraudulently induce prospective lenders to loan PCI at

4

least $45 million and for GECC's assistance in concealing PCI's fraudulent Costco purchase order financing scheme from current and prospective lenders.

Feehan and GECC accepted Petters' offer and entered into a corrupt agreement with Petters, PCI and Petters Capital under which GECC agreed to take concerted action for the unlawful purpose of allowing PCI to perpetuate its fraudulent Costco purchase order financing scheme and to use money obtained by PCI by means of using false transaction documents to promptly pay the approximately $45 million owed by Petters Capital to GECC as of October 24, 2000, and "earn" GECC a windfall in the form of substantial "success fees" on transactions that GECC knew were not legitimate.  Feehan agreed to do just that and play ball with Petters to benefit GECC to the detriment of future Petters lenders such as Plaintiffs.

*Id.* ¶¶ 45–47.

As for repayment of the Petters Capital Line, Ritchie alleges that, on October 24, 2000, Petters sent GECC "at least seven worthless checks in the amount of $5 million each and one check in the amount of $3.5 million." *Id.* ¶ 48.  GECC agreed to hold those checks until Petters told GECC that he had obtained sufficient funds for those checks to clear.  *Id.*  However, Ritchie also alleges that, the same day, Petters sent Feehan nine checks, each for $5 million (for a total of $45 million).  *Id.* ¶ 49.  GECC then gave Petters a "release" instrument stating that Petters Capital had paid off its debts under the Petters Capital Line.  *Id.* ¶ 50.  As part of its agreement with Petters, the Complaint alleges, GECC "kept silent about Petters' fraud[]" after October 27, 2000.  *Id.* ¶ 51.

The Complaint further alleges that, on October 27, 2000, "Petters and GECC fraudulently induced" Universal Capital Partners ("Universal Capital") to loan PCI $15 million based on misrepresentations about an agreement between Petters and Circuit City.  *Id.* ¶ 52.  Specifically, Petters "falsely represented" that PCI had the opportunity to buy $50 million worth of consumer goods from Circuit City for $28 million.  *Id.*  "To induce Universal Capital to request a $15 million loan from GECC under Universal Capital's credit agreement with GECC, . . . Petters

intentionally misrepresented to Universal Capital that PCI would be contributing the $13 million balance of the purchase price" for the Circuit City goods.  *Id.* ¶ 53.  On October 27, Universal Capital requested, and GECC granted, a $15 million loan for Universal Capital to provide to PCI. *Id.* ¶¶ 54–55.  This $15 million was transferred to PCI's bank account, and then "immediately transferred from that account to an account in the name of GECC."  *Id.* ¶ 56.  When GECC loaned $15 million to Universal Capital, it knew that PCI did not have the funding to contribute its $13 million share for the Circuit City transaction.  *Id.* ¶ 57.  And by October 31, 2000, GECC knew that PCI had obtained $15 million through false transaction documents and that PCI used the proceeds of Universal Capital's $15 million loan "to pay debts that Petters Capital owed to GECC."  *Id.* ¶ 58.

Ritchie alleges that—"[b]y means of false transaction documents, intentional misrepresentations and GECC's knowing, voluntary and substantial assistance"—PCI was able to fraudulently induce new loans in order to repay the $45 million it owed GECC.  *Id.* ¶ 59.  By December 8, 2000, Petters had repaid GECC.  *Id.*  However, as part of the "corrupt agreement" between Petters and GECC, "GECC did not file a UCC-3 termination statement with the Minnesota Secretary of State to terminate the UCC-1 financing statement that GECC had filed with respect to Petters Capital in March 1998."  *Id.* ¶ 60.  And, Ritchie alleges, by leaving the GECC UCC-1 financing statement on record, GECC knowingly participated in a scheme with Petters to "create the false appearance that Petters Capital and GECC had an ongoing debtor/creditor relationship after December 8, 2000, with the intent to fraudulently induce prospective lenders to make purchase order financing loans to PCI and related companies in reliance on intentional misrepresentations of material facts concerning PCI's relationships with GECC."  *Id.*

6

**b.**      **The Red Tag Capital Line**

As for the Red Tag Capital Line, between October 27, 2000, and March 20, 2001, GECC received more than $14.5 million in payments from Red Tag.  *Id.* ¶ 61.  On December 20, 2000, Red Tag requested a substantial loan advance from GECC to finance the purchase of goods and sell them to Costco.  *Id.* ¶ 62.  Feehan asked Petters how GECC would know if Petters was merely trying to obtain new loans to pay off the debts that Petters Capital had incurred in paying $45 million to GECC under the Petters Capital Line.  *Id.* ¶ 63.  Petters sent Feehan copies of 11 checks (from National Clothing Co., Inc. ("National Clothing")) ostensibly to prove that Costco had paid PCI.  *Id.* ¶¶ 64–65.  Upon receiving these checks, Feehan instructed Jack Morrone to call the bank on which the checks were drawn to ensure their authenticity.  *Id.* ¶ 66.  The bank informed Morrone that (1) all of the checks had actually been issued to payees other than PCI, and (2) the checks had been issued in different amounts than those stated on the copies that Petters supplied to Feehan.  *Id.* ¶ 67.

On December 27, 2000—seven days after GECC discovered that these checks were fraudulent—Red Tag informed GECC that Red Tag's auditor, Ernst & Young LLP ("E&Y"), was auditing its financial statements.  *Id.* ¶ 69.  Red Tag requested that GECC provide E&Y with certain information, including the nature of any defaults.  *Id.* ¶ 70.  As of January 1, 2001, Red Tag still owed GECC millions of dollars.  *Id.* ¶ 71.  On January 30, 2001, GECC informed E&Y that Red Tag had committed a "Net Worth Covenant Event of Default," but, Ritchie alleges, deliberately omitted the fraudulent check default, because disclosure would have (1) exposed Petters' fraudulent scheme, and (2) imperiled GECC's odds of recouping its investment.  *Id.* ¶¶ 72–75.

By March 20, 2001, Red Tag's credit facility was satisfied in full, thus ending GECC's lending relationship with Petters and his companies.  *Id.* ¶ 61.

### 3.    Allegations Involving Other Entities

Ritchie makes a series of allegations that are not relevant here.  In short, these allegations are that, between 2000 and 2003, GECC "substantially assist[ed]" Petters in his fraudulent dealings that affected a series of entities not plaintiffs here: the Westford/Epsilon funds; Granite Investors Fund, L.P.; Equitec Group, LLC; and Lancelot Investors Fund, Ltd.  *See id.* ¶¶ 79–94. Because these allegations do not concern Ritchie, are not otherwise relevant, and are confusing, the Court does not discuss them further.

### 4.    Ritchie's Lending Relationship with Petters

"Between February 1, 2008 and May 9, 2008, Petters fraudulently induced Plaintiffs to make a series of loans to Petters and one or more of his companies totaling $189 million."  *Id.* ¶ 101.  Plaintiffs lost at least $157 million "[a]s a direct and proximate cause of GECC's decision to join" Petters' fraud and to conspire with him.  *Id.* ¶ 102.

### 5.    The Civil and Criminal Proceedings Involving Petters and his Entities

Petters' criminal trial started in October 2009; until that trial, plaintiffs did not discover, and could not have discovered, GECC's actions in aiding Petters.  *Id.* ¶ 103.  Petters was convicted and sentenced to 50 years in prison.  *See United States v. Thomas J. Petters*, No. 08 Cr. 364 (RHK) (AJB) (D. Minn.); *see generally* U.S. Dep't of Justice, *News Release: Tom Petters sentenced to 50 years in federal prison for orchestrating $3.7 billion Ponzi scheme*, Apr. 8, 2010, *available at* http://www.justice.gov/usao/mn/econ/econ0413.pdf (last visited August 3, 2015).

Bankruptcy proceedings have also been ongoing as to PCI and other Petters-affiliated entities.  On October 8, 2010, Douglas Kelley, as Bankruptcy Trustee, filed a Complaint in the Minnesota Bankruptcy Court against GECC seeking turnover of any and all transfers and pay-offs made by PCI, Petters Capital, or any other affiliate of PCI to GECC on the grounds that they constituted "property of the estate to be recovered and administered by the trustee" and preserved for the benefit of defrauded creditors.  *See* No. 10 Bk. 4418 (D. Minn. Bankr. Ct.), Dkt. 1.  The Trustee's Complaint alleged, *inter alia*, 13 counts of fraudulent transfer, and sought to recover nearly $300 million from GECC.  *Id.*

On June 28, 2012, the Minnesota Bankruptcy Court approved a settlement agreement between the Trustee and GECC, concluding that approval of the settlement agreement was in the best interests of the debtors, their creditors, their estates, and other parties in interest.  Under the settlement, GECC agreed to pay $19 million in "full, final, and complete settlement of all claims that the debtors, Petters Estates, the Trustee or the Receiver have released and not reserved in this Agreement."  *See* No. 08 Bk. 45257 (D. Minn. Bankr. Ct.), Dkt. 1733 (Order Approving Settlement Agreement, June 28, 2012), ¶ 2.

### B.    Procedural Background

On September 23, 2014, Ritchie filed suit against GECC in New York State Supreme Court in Manhattan, initiating the suit by means of a Summons with Notice.  Dkt. 1, Ex. A.  On October 29, 2014, GECC filed its notice of removal.  Dkt. 1.  On November 14, 2014, GECC filed a motion with the JPML, seeking the transfer and consolidation of four actions pursuant to 28 U.S.C. § 1407.  *See* Dkt. 7.  On November 24, 2014, GECC moved this Court for a stay of all pretrial proceedings until the JPML ruled on GECC's consolidation motion.  *See* Dkt. 8–10.  On November 26, 2014, Ritchie moved for remand to state court, arguing that GECC's notice of

removal was untimely.  *See* Dkt. 14–16.  After the parties briefed these motions, the Court

denied Ritchie's remand motion and otherwise granted GECC's motion to stay.  Dkt. 33.  The

Court found the removal timely because Ritchie's Summons with Notice did not state its

citizenship, which meant that the removal clock did not begin to run until Ritchie informed

GECC of its citizenship; GECC timely removed the following day.  Dkt. 34.

On February 4, 2015, the JPML declined to consolidate the four Petters-related actions

against GECC.  *See* Dkt. 37.  This litigation then moved forward.  On March 11, 2015, Ritchie

filed its Complaint.  Dkt. 42.  On April 6, 2015, GECC filed its motion to dismiss, Dkt. 45, along

with a brief, Dkt. 48 ("GECC Br."), and an accompanying declaration, Dkt. 46.  On May 15,

2015, Ritchie filed a brief in opposition to GECC's motion.  Dkt. 54 ("Ritchie Br.").  And on

June 5, 2015, GECC filed a reply brief in further support of its motion, Dkt. 56 ("GECC Reply

Br."), along with a declaration, Dkt. 56-1.[3]

## II.    Applicable Legal Standards

### A.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that

---

[3] On April 10, 2015, the Court transferred a different case to the District of Minnesota that also
involves these Ritchie plaintiffs and the fallout from the Petters fraud.  *See Ritchie Capital
Mgmt., L.L.C. v. U.S. Bank Nat. Ass'n*, No. 14 Civ. 8513 (PAE), 2015 WL 1611391 (S.D.N.Y.
Apr. 10, 2015).  Accordingly, the Court gave both parties, in this case, an opportunity to address
whether a transfer is appropriate here, too.  *See* Dkt. 52.  Neither party expressed support for a
transfer at this time, although GECC clarified that, if its motion to dismiss were denied, it would
then support a transfer to the District of Minnesota.  *See* Dkt. 53.  The Court agrees with the
parties that, in applying the familiar factors bearing on the appropriateness of transfer, *see id.* at
*4; *Keitt v. New York*, No. 12 Civ. 2350 (PAE), 2013 WL 3479526, at *2–3 (S.D.N.Y. July 10,
2013), transfer is not presently required.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citing *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## B.     Rule 9(b)

As to claims alleging fraud, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard.  Such claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), "a complaint must 'allege facts that give rise to a strong inference of fraudulent intent.'" *Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Cont'l Petroleum Corp. v. Corp.*

11

*Funding Partners, LLC*, No. 11 Civ. 7801 (PAE), 2012 WL 1231775, at *3 (S.D.N.Y. Apr. 12,

2012) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006)) (internal

quotation marks omitted).  The particularity requirement of Rule 9(b) "serves to 'provide a

defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from

improvident charges of wrongdoing, and to protect a defendant against the institution of a strike

suit.'"  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quoting *O'Brien v. Nat'l Property

Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).

III.    **Discussion**

       The Court analyzes Ritchie's negligence claim first, and then addresses its aiding and

abetting fraud claim as well as its civil conspiracy claim.[4]

       A.      **Ritchie's Negligence Claim**

       As an initial matter, Ritchie's negligence claim is time-barred:  New York imposes a

three-year statute of limitations for negligence claims.  *See* N.Y. CPLR § 214(4) ("The following

actions must be commenced within three years: . . . an action to recover damages for an injury to

property except as provided in section 214-c."); *see also One Beacon Ins. v. Terra Firma Constr.

Mgmt. & Gen. Contracting, LLC*, No. 02 Civ. 7492 (SAS), 2004 WL 369273, at *3 (S.D.N.Y.

Feb. 26, 2004).  There are exceptions to this general rule, but none applies here.  *See* N.Y. CPLR

§ 214-c.  Ritchie alleges that it discovered GECC's conduct in late 2009, during the Petters

---

[4] Both parties primarily apply New York law, and Second Circuit case law, to this dispute.  *See,
e.g.*, GECC Br. 11, 16, 20, 25; Ritchie Br. 6, 10, 12, 16, 19.  In any event, GECC helpfully—and
correctly—explains that, to the extent that other states (like Minnesota and Illinois) might also
have an interest in this dispute, the same substantive law would obtain under these states' laws.
*See* GECC Br. 16 n.10.  Ritchie does not dispute that point; it relies on New York law.  *See, e.g.*,
Ritchie Br. 6, 10, 12, 16, 19.

criminal trial.  Compl. ¶ 103.  Ritchie filed this lawsuit on September 23, 2014, nearly five years

later.  Dkt. 1, Ex. A.  Accordingly, Ritchie's negligence claim is time-barred.

In any event, on the merits, Ritchie's allegations do not state a claim.  To prevail on a

negligence claim, a plaintiff must establish "(1) a duty owed by the defendant to the plaintiff,

(2) a breach thereof, and (3) injury proximately resulting therefrom."  *Solomon ex rel. Solomon*

*v. City of New York*, 66 N.Y.2d 1026, 1027 (1985); *see also Akins v. Glens Falls City Sch. Dist.*,

53 N.Y.2d 325, 333 (1981).  Thus, a party cannot be liable for negligence unless it owes a duty

to the plaintiff, which it violates, thereby causing the plaintiff's harm.  *Alfaro v. Wal-Mart*

*Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000).

Ritchie does not allege that it had any direct communication, interaction, or involvement

with GECC.  As a result, Ritchie pleads that the basis for GECC's duty to Ritchie is that GECC

"had a special relationship with Petters and his companies," which created duties to "foreseeable

lenders that Petters would prey upon."  Compl. ¶ 131.  However, New York recognizes only

certain, well-established "special relationships": (1) employers with respect to their employees,

(2) owners of premises with respect to those who occupy those premises, (3) common carriers

with respect to their patrons, (4) hosts who serve alcoholic beverages to their guests, and

(5) parents with respect to their children.  *See, e.g.*, *Rabin v. Dow Jones & Co.*, No. 14 Civ. 4498

(JSR), 2014 WL 5017841, at *2 (S.D.N.Y. Sept. 23, 2014); *Fahenstock & Co., Inc. v. Castelazo*,

741 F. Supp. 72, 76 (S.D.N.Y. 1990).  There is no support in the law for the lender-to-lender

special relationship that Ritchie asks the Court to find.  And those courts to have addressed the

issue have held that there is "no [lender-to-lender] duty to warn."  *See, e.g.*, *In re Sharp Int'l*

*Corp.*, 403 F.3d 43, 51 (2d Cir. 2005).  The reason for the limited number of special relationships

is clear:  "Courts are . . . cautious in extending liability to defendants for their failure to control

the conduct of others." *Vumbaca v. Terminal One Grp., Ass'n L.P.*, 859 F. Supp. 2d 343, 371

(E.D.N.Y. 2012) (quoting *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232–33 (2001))

(brackets omitted).

Ritchie argues that "[a] special relationship can arise where, as here, the defendant

'occupies a special position of confidence and trust with the injured party such that reliance on

the negligent misrepresentation is justified.'" Ritchie Br. 19 (quoting *E*Trade Fin. Corp. v.

Deutsche Bank AG*, No. 05 Civ. 0902 (RWS), 2008 WL 2428225, at *24 (S.D.N.Y. June 13,

2008)). This is a correct statement of law, but Ritchie errs in applying it here. The cases Ritchie

cites involve *direct* relationships between the plaintiff and defendant. *See, e.g.*, *E*Trade*, 2008

WL 2428225 (representations by defendant to plaintiff as to value of an asset); *Kimmel v.

Schaefer*, 89 N.Y.2d 257 (1996) (representations by defendant to plaintiff to induce investment

in venture). There is no direct relationship here. Ritchie invested with Petters fully seven years

after GECC ceased lending to Petters; Ritchie never had any contact or communication with

GECC; and thus there was *no* relationship between Ritchie and GECC, let alone a special

relationship of trust and confidence. GECC thus had no duty to Ritchie, and Ritchie's

negligence claim is therefore dismissed.

> **B.    Ritchie's Claims of Aiding and Abetting Fraud, as well as Civil Conspiracy**

GECC argues that Ritchie's two remaining claims should be dismissed because Ritchie

lacks standing to bring them as only the Petters Bankruptcy Trustee may do so, and because,

even if Ritchie has standing, its allegations fail to state a claim. The Court addresses standing

first, and then the merits.

### 1.      Whether Ritchie Has Standing

GECC argues that Ritchie lacks standing to sue GECC for aiding and abetting fraud and for civil conspiracy, because those causes of action are property of the Petters bankruptcy estates—and the Petters Trustee has already asserted these claims against GECC.  GECC Br. 8–15.  GECC notes that, this year, two courts have already found that claims in analogous cases are property of the Petters bankruptcy estates.  *See Gecker v. Gen. Elec. Capital Corp.*, No. 14 Civ. 8447 (SIS), 2015 U.S. Dist. LEXIS 97658 (N.D. Ill. July 27, 2015) (available at Dkt. 57); *Ritchie Capital Mgmt., L.L.C. v. Opportunity Fin., L.L.C.*, 2015 Minn. Dist. LEXIS 1 (Minn. Dist. Ct. Jan. 15, 2015) (available at Dkt. 56, Ex. 5).  In opposition, Ritchie contends that it has standing because the Petters Trustee lacks standing, partly because the Trustee is barred by the doctrine of *in pari delicto*, Ritchie claims.  Ritchie Br. 5–12.

### a.      Applicable Legal Principles

The Bankruptcy Code defines "property of the estate" as comprising, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Such interests include "causes of action possessed by the debtor at the time of filing," *Jackson v. Novak (In re Jackson)*, 593 F.3d 171, 176 (2d Cir. 2010), as well as "[a]ny interest in property that the trustee recovers" under specified Bankruptcy Code provisions, 11 U.S.C. § 541(a)(3).  "Every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of" the bankruptcy estate.  *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (brackets and citation omitted).

Significant here, to promote the orderly resolution of all claims and prevent creditors from racing to the courthouse to achieve preferential recoveries, the bankruptcy trustee "has 'exclusive standing' to assert causes of action belonging to the estate."  *Sec. Investor Prot. Corp.*

*v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 430 (Bankr. S.D.N.Y. 2010), *aff'd sub nom.*
*In re Madoff*, 848 F. Supp. 2d 469 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Inv.*
*Sec. LLC*, 740 F.3d 81 (2d Cir. 2014) ("*Madoff*"). By contrast, where the cause of action
"belongs solely to the . . . creditors, the trustee has no standing to assert it." *Id.* (quoting *McHale*
*v. Alvarez (In re The 1031 Tax Group, LLC)*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008)). The
key distinction, then, is between causes of action that may be brought only by the trustee, and
those that may be brought only by creditors.

      "If a claim is a general one, with no particularized injury arising from it, and if that claim
could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim,
and the creditors are bound by the outcome of the trustee's action." *St. Paul Fire & Marine Ins.*
*Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989). In other words, general claims affect the
creditors as a class; they are not unique to individual creditors. *See In re Cabrini Med. Ctr.*, 489
B.R. 7, 22 (S.D.N.Y. 2012). General claims must be brought by the trustee, for the benefit of all
creditors. *See id.* ("What is relevant is that the kind of harm alleged by the State Court complaint
was no different from the harm suffered by the unsecured creditors of Cabrini generally. . . .
Once the [bankruptcy] petition was filed, all such claims became property of the estate."). 
Particularized claims, by contrast, are specific to that plaintiff, in that his injury is "directly
traced to" the non-debtor's conduct. *St. Paul Fire & Marine Ins.*, 884 F.2d at 704. Examples
include where a defendant violated "an independent legal duty in its dealing with plaintiffs," *In*
*re Johns-Manville Corp.*, 517 F.3d 52, 63 (2d Cir. 2008), *rev'd and remanded on other grounds*
*sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009), or where a defendant directly,
knowingly misled plaintiffs to induce them to purchase securities issued by the debtor, *see*

*Madoff*, 740 F.3d at 92–93 (describing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 578–81 (5th Cir. 2008)).

As noted, two recent cases have applied these principles in *Petters*-related litigation.  In one, Ritchie was the plaintiff; in the other, GECC was the defendant; but in both, the courts found that the causes of action were property of the Petters Bankruptcy Trustee.  In the first, the plaintiffs—the same Ritchie entities that are plaintiffs here—brought claims for aiding and abetting fraud, civil conspiracy, and unjust enrichment.  *Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *2.  Plaintiffs claimed that defendants (1) lent to Petters before December 2007; (2) discovered Petters' Ponzi scheme in December 2007, at which point they stopped lending to Petters; and (3) demanded that Petters accelerate all loan repayments to defendants, knowing that Petters could repay their loans only by defrauding new investors.  *Id.*

A Minnesota state court held that these causes of action were property of the Petters bankruptcy estates:

> Plaintiffs allege facts that are virtually identical to the allegations contained in the Trustee's adversarial proceeding against Defendants.  It is the same story: Defendants were early investors; obtained rates of return too good to be true; knew that the dummy paper purchase orders were bogus; knew Petters was using late-invested money to pay early investors; and met with Petters in December 2007, confronting him and demanding accelerated loan repayment.  Importantly, Plaintiffs' and Trustee's accusations are also similar in what they *do not* allege: they do not allege any duty owed by Defendants to Plaintiffs; they do not allege any misconduct or misrepresentations by Defendants to Plaintiffs.  In that way, they are wholly distinguishable from either *Manville III* or *Picard* where the defendants (investment managers and insurance agents) themselves were alleged to have made misrepresentations and themselves alleged to owe a legal duty to the plaintiffs.  Here, Plaintiffs and Defendants were strangers to one another.

*Id.* at *13–14.

In the second case, the plaintiff lent money to Petters in 2007 and 2008, and sought to recover the money it lost, arguing that its losses were "caused by GECC's alleged actions in

support of the Petters Ponzi scheme between 1998 and 2003." *Gecker*, 2015 U.S. Dist. LEXIS

97658, at *26.  GECC argued that plaintiff lacked standing.  A federal district court in Illinois

agreed:

> Here, plaintiff's complaint against GECC alleges that Ark was injured by the same conduct that the Petters Trustee, in its complaint against GECC, alleged harmed the bankruptcy estates: furthering the Ponzi scheme by concealing information that, if disclosed, would have exposed that the Petters enterprises were a fraud [].  While the causes of action, legal theories and damages amounts asserted by the Petters Trustee differed from those asserted here by plaintiff, "the injury for which relief is sought" is not "peculiar and personal" to Ark, but "general and common to the corporation and creditors."  [*Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987)].  Put another way, the GECC conduct that plaintiff alleges caused Ark to suffer harm is the same conduct that any entity that invested in the Petters entities (at least after 2003) could claim caused it to suffer harm.  The conduct alleged, and the resulting harm, is not unique to Ark. . . .
>
> [A]ll of plaintiff's claims against GECC depend on GECC's alleged misconduct with respect to the Petters bankruptcy estates.  Plaintiff itself had no direct dealings in this case with GECC and suffered no unique harm.  Thus, we agree with defendant that plaintiff lacks authority to bring the claims in her complaint.  To find otherwise would be to allow plaintiff to "artfully plead [her] way out of bankruptcy court."  [*Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 442 (4th Cir. 1999).]

*Gecker*, 2015 U.S. Dist. LEXIS 97658, at *22–23, *27.

### b.    Application

To call these recent cases *analogous* to the present one seems almost an understatement.

For all intents and purposes, these two recent cases are *identical* to this one.  In all three cases,

later lenders of Petters sued earlier lenders who had allegedly discovered Petters' fraud but failed

to report it.  *See* Compl. ¶¶ 1, 6; *Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *2; *Gecker*,

2015 U.S. Dist. LEXIS 97658, at *13–14.  In all three, the plaintiffs brought state-law claims of

aiding and abetting fraud and civil conspiracy to commit fraud.  *See* Compl. pp. 24, 27;

*Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *2; *Gecker*, 2015 U.S. Dist. LEXIS 97658, at

*1–2.  In all three, the central theory of liability is that the defendants helped perpetuate Petters'

Ponzi scheme ostensibly in return for prompt payment, in full, of their loans.  *See* Compl. ¶ 1;

*Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *2; *Gecker*, 2015 U.S. Dist. LEXIS 97658, at

*1–2.  In all three, there was no direct relationship or communication between the plaintiffs and

defendants.  *See* Compl.; *Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *14–15; *Gecker*, 2015

U.S. Dist. LEXIS 97658, at *20.  In all three, the defendants had no duty to the plaintiffs.  *See*

*supra*, pp. 13–14; *Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *13; *cf. Gecker*, 2015 U.S.

Dist. LEXIS 97658.  Finally, in all three cases, no facts were alleged that that distinguishes the

plaintiffs' injury from that of other creditors of Petters.

The Court therefore agrees, in full, with the cogent analyses of the other two courts to

recently address these issues:  Ritchie's allegations are not specific to Ritchie, but instead are

allegations of generalized harm.  Any creditor of Petters (after 2000) could make the same claim

that Ritchie has here—and some have, *see, e.g.*, *Gecker*, 2015 U.S. Dist. LEXIS 97658.  Indeed,

claims that arise in the aftermath of a Ponzi scheme are classic examples of generalized harm.

*See, e.g.*, *Sec. Inv. Prot. Corp.*, 429 B.R. at 431–32 ("In no way were the [plaintiffs] in privity

with the [defendants]; rather, they were directly invested with [Madoff].  Nowhere do the

[plaintiffs] contend that the [defendants] owed a separate duty, or caused a separate harm,

particularly to them.").  Therefore, these two causes of action belong to the Petters Trustee.

*Accord Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *13–14; *Gecker*, 2015 U.S. Dist. LEXIS

97658, at *20.

Making this conclusion even clearer, the Petters Trustee actually made these allegations

against GECC in its adversary proceeding.  The Petters Trustee asserted claims of actual and

constructive fraudulent transfer, unjust enrichment/equitable disgorgement, and related causes of

19

action against GECC arising out GECC's lending relationship with Petters Capital and Red Tag. *See, e.g.*, No. 10 Bk. 4418 (D. Minn. Bankr. Ct.), Dkt. 1 (Complaint); No. 08 Bk. 45257 (D. Minn. Bankr. Ct.), Dkt. 1733. Ritchie now attempts to re-litigate—but for its sole benefit, rather than for all creditors' benefit—the same series of events. The Petters Trustee's Complaint and Ritchie's Complaint share the following core allegations:

- GECC lent to Petters Capital and Red Tag, and the credit agreements provided for GECC to be paid success fees. Tr. Compl. ¶¶ 29–33; Ritchie Compl. ¶¶ 24, 61.

- In mid-2000, Petters Capital purposely misrepresented to GECC that accounts receivable from Costco secured payment of the outstanding loans owed to GECC. Tr. Compl. ¶ 62; Ritchie Compl. ¶¶ 33.

- In response to Feehan's concerns about nonpayment, GECC contacted Costco directly and learned that the purchase orders were not Costco's—and thus that Petters was operating a fraud. Tr. Compl. ¶ 62; Ritchie Compl. ¶¶ 39–42.

- Before GECC received $45 million in payments, GECC knew of Petters' fraudulent scheme, including forged and fraudulent purchase orders and checks. Tr. Compl. ¶¶ 62; Ritchie Compl. ¶¶ 40, 44, 45, 47.

- In connection with a Red Tag financing request in December 2000, Petters sent GECC copies of Costco checks, GECC checked with the bank, and the bank told GECC the checks had been issued for different amounts. Tr. Compl. ¶ 62; Ritchie Compl. ¶¶ 65–67.

- GECC deliberately used its leverage to obtain payments—inequitable conduct that benefited GECC to the detriment of other stakeholders, including other creditors. Tr. Compl. ¶ 166; Ritchie Compl. ¶¶ 47, 68, 109, 112.

The foregoing demonstrates that, although the names of the causes of action asserted by the Petters Trustee and Ritchie may vary somewhat, the allegations underpinning them overwhelmingly overlap. Individual creditors may not avoid standing requirements through "artful repleading of [fraudulent conveyance] claims." *Madoff*, 740 F.3d at 92 (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1043 (2d Cir. 1986)). Because the purpose of 11 U.S.C. § 544(b) is to protect the trustee's ability to administer the debtor's estate, the putative

state law cause of action and the trustee's fraudulent conveyance cause of action need not have "identical elements." *Ruppert Landscaping*, 187 F.3d at 441.  Rather, if the putative state law cause of action has "the same focus" as a fraudulent conveyance action under 11 U.S.C. § 548(b), then only the trustee has standing to bring the claim.  *Id.*; *accord Sec. Inv. Prot. Corp.*, 429 B.R. at 437; *In re Bridge Info. Sys., Inc.*, 325 B.R. 824, 835 (Bankr. E.D. Mo. 2005), *aff'd*, 344 B.R. 587 (E.D. Mo. 2006).

Here, Ritchie's putative claims unavoidably have the same focus as the Petters Trustee's claims.  This confirms that only the Petters Trustee has standing to bring these claims—claims that it brought, and settled.  And the bankruptcy court approved that settlement—without objection from Ritchie.  *See* No. 08 Bk. 45257 (D. Minn. Bankr. Ct.), Dkt. 1733 (Order Approving Settlement Agreement, June 28, 2012).

Finally, Ritchie's arguments to the contrary are unavailing.  Its first—that the Petters Trustee lacks standing to assert these claims—is refuted by the foregoing account, which makes clear that these causes of action are property of the Petters estates and were, in fact, asserted by the Petters Trustee.  Ritchie protests that the Petters estates suffered "absolutely no damage," Ritchie Br. 7, but courts have routinely found harm to the debtor based on its inability to repay its creditors.  *See, e.g.*, *Opportunity Fin.*, 2015 Minn. Dist. LEXIS 1, at *14 ("[T]he injury is 'predicated upon, a legal injury to the estate namely . . . defendants' fraudulent withdrawals from the [funds created by the creator of the Ponzi scheme] of what turned out to be other . . . customers' funds.'") (quoting *Madoff*, 740 F.3d at 92).

Ritchie's second argument is that the Petters Trustee is barred from bringing these claims against GECC because of the Wagoner Rule and the related doctrine of *in pari delicto*.  The thrust of these doctrines is that a bankrupt wrongdoer may be barred from pursuing damages

claims against its "partners in crime"—third parties who participated in the unlawful conduct. Thus, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991); *see also In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997). "The rationale for the Wagoner rule is the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (citation and internal quotation marks omitted). The Wagoner Rule derives from the common law doctrine of *in pari delicto*. *See, e.g.*, *In re Hampton Hotel Investors, L.P.*, 289 B.R. 563, 574–76 (Bankr. S.D.N.Y. 2003); *Kirschner v. KPMG LLP*, 15 N.Y.3d 446 (2010). "While Wagoner is a federal rule of standing, *in pari delicto* is an affirmative defense of state common law." *In re Madoff*, 848 F. Supp. 2d 469, 484 (S.D.N.Y. 2012), *aff'd Madoff*, 740 F.3d 81 (citing *Kirschner*, 15 N.Y.3d 446).

These two doctrines have no application here. First, as noted, the claims asserted by Ritchie *are* property of the Petters estates—claims that the Petters Trustee had standing to, and did, assert. *See In re Madoff*, 848 F. Supp. 2d at 483 ("The Wagoner Rule does not . . . apply to causes of action that the Bankruptcy Code specifically confers on a trustee or a debtor in possession.") (quoting *In re Park South Sec., LLC*, 326 B.R. 505, 513 (Bankr. S.D.N.Y. 2005)); *accord Cobalt Multifamily Investors I, LLC v. Arden*, 46 F. Supp. 3d 357, 364 (S.D.N.Y. 2014). Second, the plaintiff here, Ritchie, is a third-party creditor, not the Petters Trustee; and these two doctrines do not apply under such circumstances. As explained, *in pari delicto* is an affirmative defense that must actually be pled, *Kirschner*, 15 N.Y.3d at 459 n.3; it does not apply "hypothetical[ly]," as Ritchie seeks, *In re Madoff*, 848 F. Supp. 2d at 484. Similarly, the

22

Wagoner Rule does not apply "where the Trustee did not bring the [] Actions"; to hold otherwise "would perversely require ruling on a hypothetical controversy over the Trustee's standing to bring an action that the Trustee never brought."  *Id.* at 485; *see also id.* at 484 (in cases where Wagoner Rule applied, "the party bringing the lawsuit was the Trustee, and not an individual [Madoff] customer, as here.  Because *Wagoner* implicates a trustee's standing, it was plainly at issue in those cases where the Trustee was the plaintiff.  However, the Appellants cite no case that holds that the mere possibility that a claim might be barred or subjected to a meritorious defense if it were asserted by the trustee renders the claim independent and not the property of the estate").  The Court therefore rejects both of Ritchie's arguments.  Ritchie lacks standing to bring its aiding and abetting and civil conspiracy claims.

### 2.    Whether Ritchie's Allegations State a Claim on the Merits

The Court also finds that, on the merits, Ritchie's allegations do not state a claim.  The Court therefore dismisses on this alternative ground, too.

### a.    Aiding and Abetting Fraud

To state a claim for aiding and abetting fraud, a plaintiff must show "'(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud.'"  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009)); *accord Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).

Focusing on the third prong, a "defendant provides substantial assistance only if [she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables [the fraud] to proceed."  *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 256 (S.D.N.Y.

2005) (quoting *Nigerian Nat'l Petrol. Corp. v. Citibank, N.A.*, No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999)).  Whether the assistance is substantial "is measured, in turn, by whether 'the action of the aider and abettor *proximately caused* the harm on which the primary liability is predicated." *Id.* (quoting *In re WorldCom. Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 560–61 (S.D.N.Y. 2005)) (emphasis added).  As Ritchie notes, "[t]he substantial assistance element has been construed as a causation concept, requiring that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated." *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 126 (S.D.N.Y. 1997).[5] Proximate cause is "the cause that directly produces an event and without which the event would not have occurred." *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 252 n.10 (S.D.N.Y. 2001).  Its less stringent counterpart, but-for causation, refers to those acts without which the harm would not have occurred.  *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir. 2013) (citing *Monahan v. Weichert*, 442 N.Y.S.2d 295, 298 (4th Dep't 1981)).

Here, Ritchie repeatedly alleges *but-for* causation.  *See* Compl. ¶ 2 ("Had GECC not conspired with Petters and aided and abetted Petters' fraud, Petters and his companies would not have been able to defraud Plaintiffs."); *id.* ¶ 6 ("Had GECC publically disclosed Petters' fraud

---

[5] *Cf. Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979) ("Werba was held to be an aider-abettor on a 'but for' theory of causation.  The District Court reasoned that 'but for' Werba's acquiescence in the 'special trade' arrangement and advancement of interest-free funds, Richardson would not have been able to finance or to conceal its massive short sale speculation.  We question whether these acts 'caused' the loss of E&H in a proximate sense, since that loss was 'caused' not by Richardson's short selling but by the failure of Richardson to inform E&H that it was short selling for its own account.  In *Landy v. Federal Deposit Insurance Corp.*, 486 F.2d 139, 163–64 (3d Cir. 1973), *cert. denied*, 416 U.S. 960 (1974), the Third Circuit construed the 'substantial assistance' requirement of aiding and abetting as a causation concept.  A 'but for' analysis was rejected as insufficient.  We agree."), *superseded on other grounds*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, 511 U.S. 164 (1994).

and reported Petters to the legal and regulatory authorities . . . , Plaintiffs and many other subsequent lenders would have avoided becoming victims of Petters' fraud."); *id.* ¶ 128 ("GECC's aiding and abetting of Petters' fraudulent purchase order financing scheme allowed Petters and his companies to expand their multi-billion [dollar] scheme through 2008."). Ritchie does not, however, allege any conduct by GECC that *proximately* caused Ritchie's losses. Other than GECC's failure to reveal Petters' fraud, the only other action GECC allegedly took was the issuance of the January 2000 recommendation letter. *Id.* ¶¶ 30–31. Ritchie does not allege that it in fact ever read this letter; and, in any event, it is implausible that this three-sentence opinion letter, dated January 4, 2000, *id.* ¶ 31, was the proximate cause of Ritchie's decision to lend $189 million more than eight years later, *id.* ¶ 101. To be sure, Ritchie's Complaint uses the phrase "direct and proximate cause," *id.* ¶ 102, but a plaintiff's say-so does not make it so—its factual allegations (rather than its verbal formulations) are the key. *See Iqbal*, 556 U.S. at 678.

Ritchie's failure to plead proximate cause is unsurprising, given the facts that (1) GECC finished lending to Petters in 2001 and Ritchie did not start lending to Petters until 2008, *see* Compl. ¶¶ 61, 101; (2) Ritchie does not allege that GECC ever contacted or communicated with Ritchie; and (3) Ritchie alleges (and thus admits) that GECC was repaid with funds from "[o]ther [l]enders," rather than from Ritchie, *id.* at p. 13, header F. The essence of Ritchie's Complaint is that GECC could have, but did not, expose Petters' fraud, and thus likely end it. *Id.* ¶¶ 2, 6. Given Ritchie's allegations, GECC's role was at most a but-for cause of Ritchie's losses; Petters, of course, was the proximate cause of Ritchie's losses. *Id.* ¶ 101 ("Between February 1, 2008 and May 9, 2008, *Petters* fraudulently induced Plaintiffs to make a series of loans to Petters and one or more of his companies totaling $189 million.") (emphasis added). Because allegations

25

amounting to but-for causation are insufficient, *Winnick*, 406 F. Supp. 2d at 256; *WorldCom*, 382 F. Supp. 2d at 560–61, Ritchie has failed to state a claim for aiding and abetting.

**b.    Civil Conspiracy**

To state a claim for civil conspiracy, a plaintiff must "demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury."  *Uni-World Capital, L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 251 (S.D.N.Y. 2014) (quoting *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001)); *accord Reich v. Lopez*, 38 F. Supp. 3d 436, 461 (S.D.N.Y. 2014).

Focusing on the second prong, the overt act requirement, a plaintiff must allege facts indicating that an overt act "was done in furtherance of an agreement to commit unlawful acts." *Stutts v. De Dietrich Grp.*, No. 03 Civ. 4058 (ILG), 2006 WL 1867060, at *15 (E.D.N.Y. June 30, 2006).  Courts have held that the "overt act" typically must be an affirmative act; mere inaction is insufficient.  *Webber v. Broome*, 1989 N.Y. Misc. LEXIS 930 (N.Y. Sup. Ct. Oct. 16, 1989); *accord In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 345 (Bankr. S.D. Fla. 2013) ("[M]ere inaction may not be enough to constitute an 'overt act.'"); *Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 375 (Minn. Ct. App. 2000).  The parties focus on whether Ritchie has adequately pled that GECC committed any overt acts to further the alleged conspiracy.

Ritchie pleads five possible acts by GECC: (1) failing to report Petters' fraud to regulators or law enforcement, *see* Compl. ¶ 107; (2) declining to "exercis[e] any remedies or enforcing any obligations in connection with numerous defaults under the RedTag and Petters Capital Credit Facilities," *id.* ¶ 108; (3) "fail[ing] to withdraw or correct its January 2000

Recommendation Letter," *id.* ¶ 114; (4) allowing its UCC-1 financing statement to remain on file after Petters' repayment of the Petters Capital Line, in order to "create the false appearance that Petters Capital and GECC had an ongoing" lending relationship, *id.* ¶¶ 60, 96; and (5) issuing the letter to E&Y in January 2001, *id.* ¶ 108.

The first three alleged acts are clearly not overt *acts*; they are examples of inaction.  In each case, GECC *failed* to do something: it allegedly failed to report Petters to the authorities, to enforce contractual rights, and to withdraw a recommendation letter.  These are not acts at all.  Indeed, the Complaint repeatedly uses the term "forgo," which connotes a failure to act.  *Id.* ¶¶ 107, 108.  And as to the non-withdrawal of the recommendation letter, the Complaint literally describes it as "GECC's inaction."  *Id.* ¶ 32.  Other Petters-related lawsuits have similarly found such allegations "nothing more than inaction" and "nothing more than a failure to act."  *Palm Beach Fin. Partners*, 517 B.R. at 348.  The fourth alleged act—GECC's allowing its UCC-1 financing statement to remain on file after Petters' repayment of the Petters Capital Line—is similarly a failure to act.  In any event, Ritchie pleads that a UCC-3 financing statement termination was filed in 2003—five years before Ritchie lent to Petters.  Compl. ¶ 98.  And the fifth alleged act is, in substance, yet another failure to disclose.  Failing to allege an overt act, Ritchie's civil conspiracy claim fails.  *See, e.g.*, *Stutts*, 2006 WL 1867060, at *15.

## CONCLUSION

For the foregoing reasons, the Court grants GECC's motion to dismiss the Complaint with prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at docket number 45, and to close this case.

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: August 4, 2015
       New York, New York